# City of Newport v. Louisville & Nashville Railroad Company.

(Decided March 23, 1917.)

## Appeal from Campbell Circuit Court.

1. Railroads—Crossings—State or Municipality May Compel Railroad to Make.—By the great weight of authority, a state, in the exercise of its police power, or a municipality by the authority of the state, may compel a railroad company, without compensation, to construct and maintain suitable crossings at streets extended over the right-of-way subsequently to the construction of the railroad.

2. Railroads—Crossings—State or Municipality May Compel Railroad to Make.—The power of a state, or of a municipality by the authority of the state, to compel a railroad company, without compensation, to construct and maintain suitable crossings at streets extended over the right-of-way subsequently to the construction of the railroad, includes the power to require a railroad

company to conduct and keep in repair, at its own expense, a viaduct over its tracks along a street crossed thereby.

3. Railroads—Removal of Tracks—Power of Municipality.—A city of the second class has no authority under its charter, or at common law, to require a railroad company to remove its track from its existing right-of-way and place it upon a new right-of-way to be acquired over private property for more than a mile, and at great cost.

L. J. DISKIN, OTTO WOLFF and BRENT SPENCE for appellant.

E. S. JOUETT, H. L. STONE and J. C. WRIGHT for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

On July 21, 1913, the board of commissioners of the city of Newport, a city of the second class, adopted an ordinance requiring the appellee, the Louisville & Nashville Railroad Company, to take action in the manner therein specified, for the purpose of eliminating the grade crossings at Tenth, Eleventh and Monmouth streets, in Newport.

By the first section of the ordinance, the railroad company, at its own expense, was required, (1) to lower its tracks from Ninth street southwardly, by removing them westwardly about thirty feet from their present location and so as to pass under the Chesapeake & Ohio railroad tracks, and connect with the present tracks of the Louisville & Nashville railroad so as to eliminate the grade crossing at Tenth, Eleventh and Monmouth streets and the crossing of the Chesapeake & Ohio railroad; (2) to construct for said streets, over and above the company's tracks, substantial steel bridges, of design, material and character to be approved by the board of commissioners; (3) to build, construct and maintain such retaining walls and iron fences as may be necessary to protect the streets or private property from injury from excavations that may be made; (4) to repair, keep and maintain said bridges which are required to be constructed by the railroad company under said ordinance; and (5), to remove its tracks from their present location to a new one for a distance of about one mile, thereby requiring the company to abandon its present line and right-of-way and to acquire a new right-of-way over private property and to replace its track therein.

The railroad company having refused to comply with the ordinance, the city of Newport instituted this action on August 7, 1914, for a mandatory injunction requiring

the defendant to abolish said grade crossings and comply with the ordinance. A similar ordinance relating to the tracks of the Chesapeake & Ohio Railway Company in the same immediate neighborhood was adopted at the same time, and that company was made a defendant to this action.

The city filed a map in the case showing specifically the extent and way in which it sought a change in the present location of the railroad tracks. Upon the argument it was stated, without contradiction, that the cost of complying with the ordinance would approximate $750,000.00.

By an order made January 2, 1915, the plaintiff dismissed the action against the Chesapeake & Ohio Railway Company, without prejudice, and the case proceeded against the Louisville & Nashville Railroad Company as the only defendant.

The circuit court sustained a demurrer to the petition; and, the plaintiff having declined to further plead, the petition was dismissed. The city appeals.

Many questions were raised, and we are not advised as to the ground upon hich the circuit court rested its judgment.

The first question raised, however, in this court, relates to the power of the city of Newport to pass the ordinance in question; the railroad company insisting that this power does not exist at common law, and that no statute has conferred it upon the plaintiff. On the other hand, the city insists that it has the authority to pass the ordinance in question under its general police power to eliminate or separate dangerous grade crossings, as well as by virtue of certain sections of the charter of cities of the second class, which will be hereafter enumerated.

The record does not show whether the streets in question were extended over the right-of-way subsequently to or before the construction of the railroad; but, for the purposes of this opinion, we will take the case which is strongest against the plaintiff, and assume that the streets were extended over the right-of-way subsequently to the construction of the railroad.

While the authorities are not fully agreed upon the question, we think it is established by the great weight of authority that a state, in the exercise of its police power, or a municipality by the authority of the state, may compel a railroad company, without compensation, to construct and maintain suitable crossings at streets

extended over the right-of-way subsequently to the construction of the railroad. It has been so decided by the courts of last resort in Maine, Connecticut, Illinois, New York, Tennessee, Indiana, Texas, Mississippi, Ohio, Nebraska, New Jersey, Vermont, Minnesota, Wisconsin, and by the Supreme Court of the United States. Boston & Maine R. R. Co. v. York County, 79 Me. 386; New York, &c., R. R. Co. v. Waterbury, 60 Conn. 1; Chicago & N. W. R. R. Co. v. Chicago, 140 Ill. 309; People ex rel Kimball v. Boston & A. R. R. Co., 70 N. Y. 569; Harmon v. Southern R. R. Co., 111 Tenn. 538; Lake Erie, &c., R. R. Co. v. Shelley, 163 Ind. 36; Wabash R. R. Co. v. Railroad Commissioners, 176 Ind. 428; and Morris v. City of Indianapolis, 177 Ind. 369, Ann. Cas. 1915A 65; Texas, Gulf, C. & S. F. R. R. Co. v. Milam County, 90 Tex, 355; I. C. R. R. Co. v. Copiah County, 81 Miss. 685; Lake Shore & M. S. R. Co. v. Sharpe, 38 Ohio St. 150; Thorpe v. Rutland & Bur. R. R. Co., 27 Vt. 141, 62 Am. Dec. 625; Missouri Pacific R. R. Co. v. Cass County, 7 Neb. 396; State v. Northern Pacific R. R. Co., 98 Minn. 428; Chicago, Milwaukee & St. Paul R. R. Co. v. Milwaukee, 97 Wis. 418; N. Y., &c., R. R. Co. v. Bristol, 151 U. S. 556; Chicago, B. & Q. R. R. Co. v. Chicago, 166 U. S. 226; District of Columbia v. Brooke, 214 U. S. 138. The power has, we believe, been denied only by the states of Kansas, Louisiana and Michigan.

And, this power includes the power to require a railroad company to conduct and keep in repair, at its own expense, a viaduct over its tracks along a street crossed thereby. Chicago, B. & Q. R. Co. v. State, 47 Neb. 549, 41 L. R. A. 481, 53 Am. St. Rep. 557 (affirmed in 170 U. S. 57); Missouri Pac. R. Co. v. Omaha, 235 U. S. 121; Superior v. Roemer, 154 Wis. 345; State ex rel St. Paul v. Chicago, M. & St. P. R. Co., 122 Minn. 280; Wabash R. R. Co. v. Railroad Commissioners, 176 Ind. 428.

The extent of this power is thus stated in 8 Cyc. 871:

"The legislature may take such police regulations of railroads as are necessary for the safety of the persons and property of the public; it may compel them to construct and maintain cattle-guards, warning-posts, crossing signs, crossing-gates, planking of tracks, and kindred appliances; make all necessary and reasonable provisions for the maintenance, alteration or removal of grade crossings; require railroads to fence their rights-of-way, and make them responsible for losses caused by neglect so to do; enact ordinances for the prevention of and protection from fires, as by the establishment of fire

limits; and prescribe reasonable and *bona fide* building regulations."

Again, in 33 Cyc. 288, it is further said:

"The duty of maintaining and keeping in repair suitable crossings and of restoring highways crossed so as not to impair their usefulness, is a continuing duty, and it frequently happens that a crossing or mode of restoration originally sufficient may become insufficient by reason of subsequent conditions, increased travel, character of vehicles used, and the like, in which case it is the duty of the railroad company to do whatever the public convenience and necessity may require in order to meet such conditions, and it may be compelled by appropriate proceedings to do so, or held liable in damages for resulting injuries. Changes within the application of the foregoing rules have been held to include the construction of a bridge or viaduct at a crossing formerly constructed at grade, with the necessary excavations, embankments, and approaches therefor, the widening of a crossing or its approaches to make it sufficient to accommodate the increased amount of travel or character of vehicles used, the widening of a bridge and its approaches, the widening of the space where the street or highway passes under a railroad, and the removal therefrom of pillars or abutments which reduce the width or obstruct the use of the highway, the alteration of a railroad bridge so as to prevent the discharge of water upon a street below, lowering the grade of a railroad constructed upon an embankment to the level of a street, or the changing of the grade of the railroad in order to conform to a change in the grade of a street."

And, this power of the state may be delegated to a municipal corporation as a part of its specially delegated supervision and control over streets and highways within its boundaries, with authority to lay out and open new streets and to enforce all appropriate regulations sanctioned by the police power of the state. But the authority to exercise the extraordinary power attempted in this case must be delegated to the municipality.

Appellant contends that it is a common law right and duty of the municipality to require the elimination of a railroad crossing, if dangerous.

We are not, however, called upon by the exigencies of this case to strictly define the common law rights of municipalities as distinguished from their charter rights, since the power attempted to be exercised here is clearly

of too broad and sweeping a character to be exercised in the absence of specific authority.

Neither are we called upon to lay down a common law or charter rule defining the precise limits of the power of a municipality in regulating railroad crossings so long as they remain upon the public highway, since, in this case, the ordinance requires the appellee to remove its track from its present right-of-way and place it upon a new right-of-way to be acquired over private property for more than a mile, and at great cost. We should be slow in saying that a municipality had such a power in the absence of express charter authority.

Turning, therefore, to the charter of cities of the second class, we find the following provisions thereof relied upon by the appellant as conferring the power exercised in this case: .

(a)  Kentucky Statutes, section 3058, sub-section 1:

"To regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health,—to declare, prevent and abate nuisances on public or private property and the causes thereof."

Sub-section 20:

"To direct and control the laying and construction of steam, electric, street or other railroad tracks, bridges, turnouts and switches, poles, wires, apparatus and appliances in the streets and alleys, and the location of depot grounds within the city; to require that bridges, turnouts and switches shall be so constructed and laid as to interfere as little as possible with ordinary travel and the use of the streets and alleys, and that sufficient space shall be kept on either side of said tracks for the safe and convenient passage of teams and persons; *to require all railroad companies to construct and keep in repair suitable crossings at the intersections of streets, alleys, ditches, sewers, culverts, and to light and guard the same;* to require said companies to erect gates at certain or all street crossings; to direct the use and regulate the speed of locomotive engines, steam, electric, street or other kind of cars within the limits of the city; to prohibit and restrain railroad companies from doing any storage and warehouse business, or collecting money for storage, except in cases where the consignor or consignee of goods or wares fails to remove the same within a reasonable time from the depots of such companies, and to prohibit the making of running switches."

(b) Sub-section 25:

"To pass all such ordinances, not inconsistent with the provisions of this act or the laws of the state, as may be expedient in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufacturers, and to enforce the same by fines and penalties; and any enumeration of subjects and matters herein to be regulated shall not be construed as a limitation upon this general power."

(c) Section 3094:

"The general council shall have and exercise exclusive control and power over the streets, roadways, sidewalks, alleys, landings, wharves, public grounds and highways of the city; to establish, open, alter, widen, extend, close, grade, pave, repave, clean and keep in repair the same; to prevent and remove all encroachments thereon or obstruction thereof; to put drains and sewers in the same, and to regulate and prohibit the building of vaults and areas under sidewalks; to enforce and regulate connection with sewer, gas and water mains and conduits of all kinds laid in or under the streets and highways of the city for any purpose. The general council may, by ordinance, prescribe certain sprinkling districts and have the streets and avenues thereof sprinkled by the lowest and best bidder, assessing the cost thereof against the adjoining property per front foot."

It will be noticed, however, that these several statutory provisions, when fairly construed, relate to the authority of the city to regulate railroads and their operations so long as they occupy the streets and highways of the municipality; they nowhere attempt to confer authority upon the municipality to exercise any of these powers beyond the confines of its streets and highways, unless such a power may be found in subsection 25, which has been denominated the "general welfare clause."

In American Tobacco Co. v. St. Louis, 247 Mo. 425, relied upon by the appellant, a general welfare clause in the charter of the city of St. Louis similar to subsection 25, supra, was held to give express power to require railroads to abolish grade crossings and to carry streets over or under the tracks, at the expense of the railroad companies, whether the streets were laid out before or after the construction of the railroad.

And, in State v. Chicago, Milwaukee & St. Paul R. R. Co., 122 Minn. 281, also relied upon by appellant, it was held that while the power to require a railroad com-

pany to bridge or viaduct its streets is a police power resting in the legislature, such power was conferred upon the city by a general welfare clause couched in the same general terms as that found in the Newport charter.

But, in neither of those cases was there an attempt to regulate the location or operation of a railroad beyond the boundaries of the city streets and highways.

Silva v. City of Newport, 150 Ky. 781, 42 L. R. A. (N. S.) 1060, is relied upon by the appellant as sustaining the action of the city of Newport in this case. That case, however, merely sustained an ordinance of the city of Newport passed under the authority of subsection 25, *supra,* requiring the street car corporations of the city of Newport to provide seats or stools for their motormen, as being a reasonable regulation.

In speaking of subsection 25, *supra,* the court in the Silva case said:

"If subsection 25 of section 3058, Kentucky Statutes, were less explicit as to the subject and matters with respect to which cities of the second class may exercise the powers it confers, the closing sentence thereof, 'and any enumeration of subjects and matters herein to be regulated shall not be construed as a limitation upon this general power,' would justify us in saying that the power conferred upon the municipalities is not confined to the subjects or matters therein enumerated but may be exercised by it as to others of a like character not mentioned, which may come within the general scope of the police power of the state."

Likewise, in C., N. O. & T. P. Ry. Co. v. Commonwealth, 126 Ky. 712, 17 L. R. A. (N. S.) 561, it was said that towns of the sixth class were authorized by subsection 7 of section 3704 (a general welfare clause), to require railroad companies to adopt such signals as might be reasonably necessary to protect persons using the crossings.

It will be observed, however, that there is a radical difference between an ordinance merely regulating the operation of a street car upon a public street, and an ordinance which deprives a railroad company of its property, without compensation, by requiring it to abandon its right-of-way.

In several cases this court has declined to give its approval, in the absence of charter authority, to regu-

lations of railroads which involved their property rights as distinguished from their mere operation.

Thus in C. & O. Ry. Co. v. City of Maysville, 24 Ky. L. R. 615, 69 S. W. 728, Maysville being a city of the fourth class, it was held that the city had authority to adopt an ordinance requiring railroad companies to erect safety gates at certain street crossings because the authority was expressly conferred by subsection 25 of section 3490 of the Kentucky Statutes.

But, in C. & O. Ry. Co. v. Harmon, 153 Ky. 669, 45 L. R. A. (N. S.) 946, it was held that Prestonsburg, a city of the fifth class, was without authority to require a railroad company to erect and maintain safety gates at crossings, admittedly dangerous. The opinion pointed out the fact that although subsection 25 of section 3490 of the Kentucky Statutes conferred upon the board of council of cities of the fourth class authority to require railroad companies to erect and maintain safety gates, such authority had been withheld by the legislature from cities of the fifth class.

Again, in L. & N. R. R. Co. v. Hopkins County, 153 Ky. 718, it was held that while the legislature might prohibit or require the abolition of grade crossings, or require a railroad company, at its own expense, to construct bridges or viaducts at crossings, or authorize a municipal corporation to require such a crossing, a municipality was without such power in the absence of statutory authority.

Upon the subject of the power of a municipal corporation to require railroad companies to construct overhead or underground crossings, and to keep them in repair, see notes in 18 L. R. A. (N. S.) 915; 28 L. R. A. (N. S.) 298; L. R. A. 1915E 751; and generally, Louisville City Railway Co. v. City of Louisville, 8 Bush 415; City of Versailles v. Kentucky Highlands R. R. Co., 153 Ky. 83.

We have not overlooked Lakeshore & Michigan Southern Ry. Co. v. Clough, 242 U. S. .........., relied upon by appellant. That case merely announces the general rule above stated, that a municipality may require a railroad company, at its own expense, to do things necessary to protect the public, where the authority is given by statute, the question there being whether the Indiana statute, giving the power, denied the company due pro-

cess of law or deprived it of the equal protection of the laws.

From these authorities we think it is clear that the city of Newport was without power, in the absence of specific statutory authority, to enact the ordinance requiring the appellee to remove its track from its right-of-way, and to acquire a new right-of-way over private property in the manner and to the extent therein directed; and, there being no such specific authority, the circuit court properly sustained the demurrer to the petition.

It is not necessary for the decision of this case to say more; and, no other question is decided.

Judgment affirmed. The whole court sitting.